**Howard T. POOLE, Appellant,**

v.

**UNITED STATES, Appellee.**

**Belitta M. SHOWELL, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 90–CF–1523, 92–CO–269, 92–CO–376, 91–CF–229 and 92–CO–363.

District of Columbia Court of Appeals.

Argued April 29, 1993.
Decided Aug. 26, 1993.

---

Matthew C. Leefer, Boonsboro, MD, appointed by this court, for appellant Howard T. Poole.

Steven Semeraro, with whom Carol E. Bruce, appointed by this court, and Daniel M. Gribbon, Washington, DC, were on the brief, for appellant Belitta M. Showell.

Barbara A. Grewe, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., at the time the brief was filed, and Roy W. McLeese, III, and Robert A. Feitel, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN and FARRELL, Associate Judges, and KERN, Senior Judge.

FERREN, Associate Judge:

A jury found each appellant guilty of one count of second-degree burglary while armed, eleven counts of armed robbery, three counts of assault with intent to rob while armed, and one count of possession of a firearm during a crime of violence, based on evidence of appellants' involvement in the January 25, 1990, robbery of hair stylists and their clients at a beauty salon on Pennsylvania Avenue, S.E.[1] *See* D.C.Code §§ 22-1801(b), -2901, -3202, -501, & -3204(b) (1989 Repl. & 1993 Supp.). Both appellants challenge their convictions on a variety of grounds.

First, appellants assert that the trial court erred in denying their motions to suppress evidence discovered during the search of an apartment at 510 Ridge Road, S.E. Specifically, appellants argue that (1) the trial court was obliged to hold a hearing on their allegations that the affidavit underlying the search and arrest warrants was deficient and (2) the police violated our statutory "knock and announce" requirement, D.C.Code § 23-524(a) (1989 Repl.), by using force to enter the apartment only ten seconds after they had knocked and announced their identity and purpose. With regard to the search warrant affidavit, we conclude that appellants failed to make a *prima facie* showing that the police engaged in deliberate deceit or reckless disregard for the truth. Accordingly, appellants were not entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). We also conclude that the forced entry was justified by

---

1. After their trial, both Poole and Showell pled guilty to two counts of robbery for similar crimes that took place on January 9 and 19, 1990. Those convictions are not at issue in this appeal.

evidence of exigent circumstances which showed that the police had reason to believe Poole was armed and that there was a realistic possibility he might use deadly force against the entering police officers.

Second, appellants argue that the government violated their Sixth Amendment right to counsel at their lineups and that the trial court accordingly erred in denying their motions to suppress identification testimony based on those lineups. Assuming there was such a constitutional violation, we conclude it was harmless beyond a reasonable doubt, given the strength of the evidence, including substantial untainted identification testimony, against both appellants.

Finally, appellant Poole alleges, separately, that his defense was unfairly prejudiced at trial by the admission of other crimes evidence and by prosecutorial misconduct; that his conviction for possession of a firearm during a crime of violence should merge with his other convictions; and that the trial court erred in summarily dismissing his motion for postconviction relief. None of these claims has merit.

Accordingly, we affirm appellants' convictions in all respects.

### I. THE EVIDENCE AT TRIAL

According to the government's evidence at trial, at 7:00 p.m. on the night of January 25, 1990, a woman knocked at the door of Lady M Fashions, a clothing store on Pennsylvania Avenue, S.E. The proprietor unlocked the door, let the woman in, and locked the door again. Shortly thereafter, when the proprietor turned her head to look for some suits for this apparent customer, the woman went to the door and let in a man. The man entered with his handgun drawn and announced, "This is a holdup." When the proprietor screamed, the man threatened her: "Scream again, bitch, and I'll kill you." The man then went into Nina's Beauty Salon, which was located next door, through an adjoining interior door. Inside the beauty salon, the man began waving the gun and demanding money from the hair stylists and their customers. Meanwhile, the woman collected money from people in the salon. Then, after forcing everyone into a back room, the man and woman fled.

Nine witnesses testified at trial that they had identified Poole as the male robber either at a lineup or from a lineup photo. All these witnesses also identified Poole at trial. Five witnesses identified Showell, both in court and either at a lineup or from a lineup photo, as the armed man's female accomplice. In addition, four witnesses identified a gun with a light-colored handle, found in a search of an apartment occupied by Showell at 510 Ridge Road, S.E., as resembling the gun used in the robbery.

In his defense, Poole presented testimony from a prosthetist orthotist, *i.e.*, a specialist in designing and manufacturing prosthetic devices, that he had seen Poole in March 1989. At that time Poole walked with a limp as a result of a workplace injury which had amputated a portion of a toe. The orthotist testified that he had delivered a prosthesis to Poole in November 1989. This device helped to relieve some of Poole's pain in walking but did not immediately change Poole's gait, which would have required reeducation. The orthotist was unable to say, however, whether Poole still would have walked with a limp at the time of the robbery in January 1990. Poole's mother testified that her son still walked with a limp in January 1990. She also said that Poole lived with her at 612 Ninth Street, N.E.

Appellant Showell presented no witnesses in her behalf.

### II. THE LEGALITY OF THE SEARCH OF 510 RIDGE ROAD

#### A. The Search of 510 Ridge Road

Several days after the robbery at Nina's Beauty Salon, two of the victims, Ron Oliphant and Marion Davis, saw a man who they thought was the armed robber working on a Volvo parked on Ridge Road. Oliphant contacted the police. An officer who responded to the call found appellant Poole working on a Volvo in the 500 block of Ridge Road and warned him that repairing cars on a public street was unlawful.

Poole identified himself and said that he lived at apartment "three-something" (the officer could not remember the exact number), 510 Ridge Road, although the identification card he gave to the officer may have listed another address. The officer then radioed detectives with the address and the license plate number from Poole's car. In addition, according to the government's proffer at the suppression hearing, the police reviewed telephone records and found that Poole had a telephone listing at 510 Ridge Road. Based on this information, as well as on identifications of Poole from photo arrays, the police obtained warrants to arrest Poole and to search the premises of apartment 304 at 510 Ridge Road, S.E.

Detectives from the Robbery Branch, working in conjunction with five officers from the Emergency Response Team (ERT), a tactical group specially trained to deal with high risk situations, attempted to execute the warrants at about 8:15 a.m. on Saturday,[2] February 3, 1990. After entering the building at 510 Ridge Road, Sergeant Scott, the ERT leader, knocked on the door of apartment 304 three times with his blackjack and announced "Police, search warrant." Scott waited approximately five seconds, during which he heard nothing from inside the apartment, and then ordered the team to force the door open with a battering ram. Within ten seconds of the time that Scott had first rapped on the door, the team had begun ramming the door open. Once inside the apartment, they found appellant Showell along with a man and three small children, all in their nightclothes, watching television. Poole, however, was not there. After searching the apartment to see whether anyone else was present, the ERT team turned the premises over to detectives from the Robbery Branch. The detectives searched the apartment, finding a loaded .32 caliber Smith and Wesson revolver, five rounds of ammunition, two identification cards in Howard Poole's name and another in the name of Belitta Showell, and a photo of Showell and Poole together, among other items. Following the search, the police arrested Showell but not the male occupant.

Before trial, both appellants moved to suppress the evidence recovered from inside apartment 304, arguing that (1) the underlying search warrant was invalid because the affidavit on which it was based was defective and (2) the police violated D.C.Code § 23–524(a) by failing to wait a reasonable time before breaking open the apartment door.[3]

### B. The Validity of the Search Warrant

■ In moving for suppression of evidence obtained from the search of 510 Ridge Road, appellants argued in part that the search warrant was invalid because the affidavit on which it was based was vague and conclusory and contained false information. In particular, appellants questioned whether the police had a good faith basis for the affidavit's assertion that Poole lived at 510 Ridge Road. The only information in the affidavit on this point was that there had been a "verification" of Poole's address.[4] Appellants claimed that the affiant displayed reckless disregard for the truth in failing to take into account information known and available in public records that Poole actually lived at 612 Ninth Street, N.E. Poole's counsel also asserted at the suppression hearing that Poole had told the police he lived at 612

2. There was no evidence before the trial court as to what day of the week February 3, 1990, was. We take judicial notice of the fact that February 3, 1990, was a Saturday. *See* AM. JUR.2D *Desk Book* 114 (1993 Supp.).

3. In response, the government contends that Poole's claim that he did not live at 510 Ridge Road precludes him from asserting standing to contest the search of 510 Ridge Road. In light of our conclusions below, we need not address that issue. *See Edwards v. United States,* 619 A.2d 33, 35 (D.C.1993) (assuming, without deciding, that appellant had standing to claim that his rights were violated by warrantless entry, trial court did not err in denying suppression because entry justified by exigent circumstances).

4. The police also obtained an arrest warrant for Poole on the same day as the search warrant. The supporting affidavit for the arrest warrant listed Poole's home address as apartment 304, 510 Ridge Road, S.E., but gave no basis for that address.

Ninth Street and that his children lived at 510 Ridge Road. In response, the government proffered the information that Poole had been seen working on his car in front of 510 Ridge Road, that Poole had said that he lived at 510 Ridge Road, and that the affiant had checked telephone records and found that Poole had a phone at 510 Ridge Road.[5]

The trial court ruled that there was insufficient evidence to warrant an evidentiary hearing on this claim. The court found that the affidavit was facially adequate for the issuance of the warrant, despite the affidavit's lack of detail, and that the evidence gave no reason to doubt the good faith of the police. Appellants renew their claim on appeal.

■ "There is ... a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. at 171, 98 S.Ct. at 2684. In order to merit an evidentiary hearing on the sufficiency of an affidavit, the defendant must (1) allege "deliberate deceit or reckless disregard for the truth, ... accompanied by an offer of proof," and (2) show that the affidavit, stripped of the allegedly false material or supplemented with improperly omitted information, does not support probable cause to issue a warrant. *Dailey v. United States*, 611 A.2d 963, 967 (D.C.1992); *see also Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. We agree with the trial court that appellants failed to carry their burden. It was undisputed that Poole had been seen at 510 Ridge Road and that

he had a phone listing for that address. Given this information, the mere fact that Poole may have had another address, as defense counsel alleged, was insufficient to make out a *prima facie* showing that the police were acting recklessly in assuming that Poole lived at 510 Ridge Road. Even if the affidavit had specified that Poole also had another address, that would hardly have led to a conclusion that the police lacked probable cause to search 510 Ridge Road.

### C. The Knock and Announce Requirement

D.C.Code § 23–524(a)[6] requires that the police execute search warrants in accordance with 18 U.S.C. § 3109 (1985), which provides as follows:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

An analogous provision, applicable to the execution of search warrants for controlled substances, appears in D.C.Code § 33–565(g) (1988 Repl.).[7]

Such "knock and announce" statutes, as they are commonly known, have ancient roots in Anglo–American law.[8] *See Miller v. United States*, 357 U.S. 301, 308, 313, 78 S.Ct. 1190, 1195, 1197–98, 2 L.Ed.2d 1332

---

**5.** Additional information known to the police when they sought the search warrant later came out at trial. The officer who had investigated the initial sighting of Poole on Ridge Road said that after he told Poole not to work on his car in the street, Poole parked the car in the lot at 510 Ridge Road.

**6.** D.C.Code § 23–524(a) provides: "An officer executing a warrant directing a search of a dwelling house or other building or a vehicle shall execute such warrant in accordance with section 3109 of title 18, United States Code." Congress enacted this provision in 1974 as § 4(d) of Pub.L. No. 93–481, 88 Stat. 1455, 1456. Section 4(a) of Pub.L. No. 93–481 also repealed an earlier version of the knock and announce requirement, former D.C.Code § 23–591, that

had authorized the use of no-knock warrants. *See* Pub.L. No. 91–358, 84 Stat. 473, 630–31 (1970).

**7.** D.C.Code § 33–565(g) provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance."

**8.** For discussion of the historical background of the knock and announce requirement, see G. Robert Blakey, *The Rule of Announcement and Unlawful Entry: Miller v. United States and Ker v. California*, 112 U.Pa.L.Rev. 499 (1964); Note, *Announcement in Police Entries*, 80 Yale L.J. 139 (1970).

(1958). The requirement that government officers executing a warrant announce themselves and request permission to enter before attempting a forced entry appeared in English common law as early as 1603:

> In all cases where the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. But *before he breaks it, he ought to signify the cause of his coming, and to make request to open doors....*

*Semayne's Case*, 77 Eng.Rep. 194, 195 (1603) (emphasis added), *quoted in Miller*, 357 U.S. at 308, 78 S.Ct. at 1195. Following the lead of four justices in *Ker v. California*, 374 U.S. 23, 46, 83 S.Ct. 1623, 1646, 10 L.Ed.2d 726 (1963) (Brennan, J., dissenting), many federal courts of appeal have held that the knock and announce requirement is also inherent, at least to some degree, in the Fourth Amendment prohibition against "unreasonable searches and seizures." [9]

■ The underlying purpose of the knock and announce requirement is three-fold:

> (1) it reduces the potential for violence to both the police officers and the occupants of the house into which entry is sought; (2) it guards against the needless destruction of private property; and (3) it symbolizes the respect for individual privacy summarized in the adage that "a man's [or woman's] house is his [or her] castle."

*United States v. Bustamante–Gamez*, 488 F.2d 4, 9 (9th Cir.1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). These interests are not absolute, however, and can be overridden in certain circumstances. Thus, in line with caselaw from other jurisdictions, we have recognized two situations in which the police need not wait for an actual reply before attempting a forced entry: (1) where the police may "reasonably infer from the actions or inactions of the occupants that they have been constructively refused admittance"; and (2) where the police "are confronted with 'exigent' circumstances, such as the imminent destruction of evidence, or some danger to the entering officers." [10] *(Craig) Williams v. United States*, 576 A.2d 700, 703 (D.C.1990) (citations omitted) (construing D.C.Code § 33–565 on the basis of federal court interpretations of 18 U.S.C. § 3109); *see also Culp v. United States*, 624 A.2d 460, 462 (D.C. 1993).

### D. The Evidence and Rulings at the Suppression Hearing

Sergeant Scott, the leader of the Emergency Response Team, testified at the suppression hearing that he had based his decision to make a forced entry on several factors. First, Scott believed that "someone should have heard a knock and there should have been some sort of response" within five seconds. Second, Scott noted that he had been told that the suspect had been involved in "numerous armed robberies of beauty salons committed with display of weapons" and had previously been charged with assaulting a police officer with a weapon. Scott observed, further, that "since a weapon was displayed in these offenses and a weapon had not been recovered ... there was a possibility of this weapon being inside and it would give someone a chance to—to prepare them-

---

**9.** *See United States v. Mueller*, 902 F.2d 336, 343 & n. 6 (5th Cir.1990) (citing cases); *see also Rivera v. United States*, 928 F.2d 592, 606 (2d Cir.1991); 2 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 6.2(a), at 611 (1987). *But see United States v. Sagaribay*, 982 F.2d 906, 910 (5th Cir.1993) (declining "to hold that the Fourth Amendment inflexibly incorporates the requirements of § 3109 into its reasonableness requirement"), *petition for cert. filed*, No. 92–9165 (U.S. June 21, 1993); *United States v. Nolan*, 718 F.2d 589, 602 (3d Cir.1983) ("section 3109 ... does not embody a constitutional requirement").

**10.** Appellants cite *United States v. Sims*, 231 F.Supp. 251 (D.Md.1964), for the proposition that "reasonable belief of increased bodily harm to the arresting officer is not an exception" to the knock and announce requirement. *Id.* at 257. This case conflicts not only with settled law in this jurisdiction, but also with the overwhelming weight of authority elsewhere. *See* cases cited *infra* note 14.

selves to deal with the police. . . ." Based on this information, Scott concluded that a longer wait after the announcement "would have been detrimental to [his] team's health."

After the hearing, the trial court found that about ten seconds in all had elapsed between the ERT team's announcement and the actual forced entry into the apartment. The trial court found, further, that given the supposed size of the apartment—one or two bedrooms—it was reasonable for Scott to assume that "if anyone had been inside they would have heard the loud knock and the loud announcement." The trial court also found that, given that Scott heard no response, and bearing in mind the nature of the offenses at issue and the prior use of a weapon, it was not unreasonable for him to believe that there was a danger. The trial court then concluded that, considering the situation in context and from Sergeant Scott's perspective, the ERT team had waited a reasonable amount of time and had not violated the knock and announce statute. Thus, it appears the trial court was convinced that the forced entry was justified under both the constructive refusal and the exigent circumstances exceptions to D.C.Code § 23–524.

▆▆▆ This court must defer to the trial court's findings of fact, unless they are clearly erroneous, and must accept all inferences drawn by the trial court as long as they are supportable under any reasonable view of the evidence. *See Griffin v. United States*, 618 A.2d 114, 117 (D.C.1992). However, we review *de novo* the ultimate legal determination as to whether these facts and inferences support a conclusion that the police did not violate the statute. *See id.* at 117–18.

### E. Constructive Refusal

▆▆▆ In *Griffin*, this court recently held that a thirty-second delay between a police announcement and a forced entry into a home at 1:40 a.m. was too short for the police reasonably to conclude that they had been constructively refused admittance. At that time of the night, we noted, many, if not most, people are asleep in bed, semi-dressed, and unlikely to react quickly or rationally to a sudden knock at the door. 618 A.2d at 121–22.

In the case before us, the period of delay—a mere ten seconds—was considerably shorter than in *Griffin*. Admittedly, the forced entry in this case took place at a somewhat more civilized hour: 8:15 a.m. But it was also on a Saturday morning, a time when the factors we cited in *Griffin* are still largely applicable. At 8:15 on a Saturday morning many people will still be relatively inactive or otherwise indisposed, or even completely asleep, such that it will probably take them more than ten seconds to respond to a knock at the door. Furthermore, in this case there was no evidence that the police heard or saw anything that would have led them to believe that the occupants were awake. They did not hear the television, nor did they hear any movement. Under these circumstances, we conclude as a matter of law, from these facts, that the police could not have reasonably believed that they had been constructively refused admittance.

The cases cited to us by the government, in which courts have upheld forced entries after similarly brief delays, are all distinguishable because they involved some other factor, not evident in this case, contributing to the conclusion that there had been a constructive refusal of admittance. In several of these cases, for instance, the police heard some movement suggesting that the occupant was alert and deliberately not responding. *See United States v. Bonner*, 277 U.S.App.D.C. 271, 874 F.2d 822 (1989) (police heard retreating footsteps after they had twice announced themselves); *United States v. Ruminer*, 786 F.2d 381 (10th Cir.1986) (officers at bedroom window had seen figure run out of the room after police announcement); *United States v. Allende*, 486 F.2d 1351 (9th Cir.1973) (entry only ten seconds after knock not unlawful where officers also heard scampering sounds after knock), *cert. denied*, 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974); *Jackson v. United States*, 354 F.2d 980 (1st Cir.1965) (applying knock-and-announce requirement as

matter of common law, ten second delay, though "an exceedingly short time under most circumstances," not unlawfully brief where police, before knocking, had heard defendant moving about, followed by silence). In the one remaining case cited by the government, *United States v. One Parcel of Real Property*, 873 F.2d 7 (1st Cir.), *cert. denied*, 493 U.S. 891, 110 S.Ct. 236, 107 L.Ed.2d 187 (1989), a multi-unit dwelling was approached by three police teams, one of which had already been knocking at another entrance for some time before a member of another team entered the building through a side door, knocked at the door to the defendant's apartment, waited five to ten seconds, and then attempted a forced entry. Thus, the actual period of delay between the initial announcement and the forced entry was longer than the five to ten seconds that the second team member waited himself. Moreover, in that case, as in *Bonner*, the police had probable cause to believe that the occupants possessed cocaine, which is easily disposable.[11]

### F. Exigent Circumstances

 Alternatively, the government contends that exigent circumstances justified the forced entry. Specifically, the government argues that the police had reason to fear for their safety, because Poole was a suspect in a string of armed robberies and was known to have been previously arrested for assault on a police officer.

 Judicial determinations of the lawfulness of a forced entry are highly contextual and must be based upon a consideration of the totality of the circumstances. *See Griffin*, 618 A.2d at 120. Consequently, it is difficult to establish an absolute and unvarying test for reviewing alleged violations of the knock and announce statutes. As a general rule, however, when the government invokes concerns for police safety, based upon the possible presence of weapons, to justify a forced entry, the government must show that the police had concrete, particularized evidence that reasonably led them to believe that (1) there were weapons on the premises and (2) there was a realistic possibility that the occupant or occupants would use the weapons against them. "[A] concern for police safety must be based upon prior knowledge or direct observation that the subject of the search keeps weapons *and* that such person has a known propensity to use them." *State v. Jeter*, 30 Wash.App. 360, 634 P.2d 312, 314 (1981), *review denied*, 96 Wash.2d 1027 (1982). "Police knowledge of the existence of a firearm excuses compliance with announcement requirements only where the officers reasonably believe the weapon will be used against them if they proceed with the ordinary announcements." *People v. Dumas*, 9 Cal.3d 871, 109 Cal.Rptr. 304, 512 P.2d 1208, 1213 (1973) (en banc), *quoted in (Craig) Williams*, 576 A.2d at 706. Thus, evidence that the suspect merely possesses a weapon is insufficient to justify a forced entry.[12] Moreover, the be-

---

**11.** Similarly, in *United States v. Wysong*, 528 F.2d 345 (9th Cir.1976), where the court upheld an entry with a pass key only five or ten seconds after the police announced themselves, the police knew that the occupant had been dealing in drugs and were therefore concerned about the destruction of evidence. *See id.* at 348.

We recognize that such additional factors were absent in *United States v. Spriggs*, 996 F.2d 320 (D.C.Cir. June 18, 1993), where the United States Court of Appeals for the District of Columbia Circuit recently held that the police could reasonably infer, solely on the ground that they heard no response within fifteen seconds after they had knocked and announced themselves in a voice "slightly above a normal tone of voice," that they had been constructively refused entry. The forced entry at issue took place between 7:30 a.m. and 7:45 a.m. on a weekday morning. There were no other indica-

tions that the occupants were awake and deliberately refusing to respond, nor did the court base its holding on the existence of exigent circumstances such as the potential destruction of evidence. *Spriggs* is distinguishable from the case before us, insofar as the forced entry in this case was made at 8:15 a.m. on a Saturday morning, rather than on a weekday, and after a shorter delay of only ten seconds. But even if *Spriggs* were not distinguishable, we would decline to follow a precedent that effectively reduces the refusal requirement to a mere symbolic pause before the police break down the door.

**12.** *See United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir.1993) ("The reasonable belief that firearms may have been within the residence, standing alone, is clearly insufficient" to justify an otherwise improper entry under 18 U.S.C. § 3109.); *United States v. Fluker*, 543 F.2d 709,

lief that a weapon is on the premises and may well be used must be based upon particularized information or specific prior incidents.[13] "An unjustified but sincere fear by an officer cannot excuse noncompliance or the protection of the occupants' privacy interest would depend on no more than an officer's anxiety." *United States v. McConney*, 728 F.2d 1195, 1206 (9th Cir.)

(en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). But where the government can satisfy both prongs of the test set forth above, courts have regularly held that the police may attempt a forced entry, even when they have not initially knocked and announced their purpose.[14]

---

717 (9th Cir.1976) (fact that person believed to be inside apartment owned gun did not reasonably support belief that he was armed and constituted a threat, where there was no evidence that he had ever been convicted of illegal possession of firearms or of use of firearms in commission of crime); *State v. Piller*, 628 P.2d 976, 979 (Ariz.Ct.App.1981) (police knowledge that suspect purchased handgun insufficient to justify noncompliance with knock and announce statute); *Rodriguez v. State*, 484 So.2d 1297, 1298 (Fla.Dist.Ct.App.1986) (search warrant for stolen gun cannot, without more, support officer-peril exception to knock and announce requirement); *People v. Ouellette*, 78 Ill.2d 511, 36 Ill.Dec. 666, 401 N.E.2d 507, 511 (1979) (suspect's prior possession of handgun and pistol box insufficient to justify failure to comply with knock and announce statute, where there was no evidence that suspect's possession was illegal, that he had ever used the weapon, or that he had ever used or threatened violence against the police); *Commonwealth v. McDonel*, 411 Pa.Super. 187, 601 A.2d 302, 305–06 (1991) (officers' knowledge of suspect's two-year-old conviction for possession of unlicensed firearm combined with assumption that drug dealers commonly possess firearms insufficient to create exigent circumstances); *see also United States v. Nabors*, 901 F.2d 1351, 1354 (6th Cir.) ("We do not hold ... that every time law enforcement personnel suspect that the subject of a search warrant possesses a firearm, a split-second announcement followed by a forced entry sufficiently complies with 18 U.S.C. § 3109."), *cert. denied*, 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990). *Cf. (Janice) Washington v. United States*, 585 A.2d 167 (D.C.1991) (mere information that defendant possessed gun in her room was insufficient to justify warrantless forced entry, where police lacked probable cause to believe that gun was illegal or had been used in crime).

**13.** *See United States v. Stewart*, 867 F.2d 581, 585 (10th Cir.1989) (conclusory assumption that drug dealers in general carry a firearm insufficient to establish exigent circumstances); *Jeter*, 634 P.2d at 314 (evidence of exigency insufficient to excuse no-knock entry, even though police knew suspect kept gun and sold drugs, because they had no evidence of suspect's propensity to use gun, other than general belief that convicted felon may have such a propensity); *Dumas*, 512 P.2d at 1213 (belief that weapons will be used by occupants "must be based on

specific facts and not on broad, unsupported presumptions"). However, police need not "have specific knowledge that a particular person has previously shot a police officer" in order to support a reasonable belief that a weapon will likely be used against them. *(Craig) Williams*, 576 A.2d at 706.

**14.** *See, e.g., United States v. Singer*, 943 F.2d 758, 762 (7th Cir.1991) (no-knock forced entry justified by tips that drug dealer within possessed guns and had made threats); *United States v. Turner*, 926 F.2d 883, 887 (9th Cir.1991) (no-knock forced entry justified where police knew occupant had access to guns, and occupant had said he kept guns to protect his drugs and to use against police in the event of a raid, even though police lacked any other specific information that he currently had weapons); *Nabors, supra* note 12, 901 F.2d at 1354 (forced entry moments after police announcement not unlawful where affidavit for search warrant indicated that occupant was suspected of narcotics trafficking and illegal possession of firearms and that he habitually wore a bullet-proof vest); *United States v. Spinelli*, 848 F.2d 26, 29–30 (2d Cir.1988) (no-knock forced entry justified where sources had led police to believe suspect might be armed, suspect had been previously arrested with handgun, suspect had reputation for violence, U.S. Marshal's bulletin stated that suspect was wanted for parole violation and was armed and dangerous, and suspect was believed to be involved in manufacture of methamphetamine on premises, using highly explosive chemicals); *United States v. De Parias*, 805 F.2d 1447, 1457 (11th Cir.1986) (noncompliance with § 3109 excused where occupants were suspects in brutal kidnapping and murder and out-of-state police bulletin said they were armed and dangerous), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987); *United States v. McShane*, 462 F.2d 5, 5–6 (9th Cir.1972) (opening of unlocked screen door, followed by announcement, excused where resident had been previously convicted for firing on a police officer and escaping from custody, and informant had seen several handguns and sawed-off shotgun in resident's possession); *United States v. (Thomas) Harris*, 140 U.S.App.D.C. 270, 277–79, 435 F.2d 74, 81–83 (1970) (entry without consent, but after announcement, excused where occupants were suspected of having committed an armed robbery, in which one employee had been

■ We also note, however, that where the police are attempting to execute a warrant related to a violent crime, a lesser degree of exigency is required if the police have at least knocked and announced themselves before making a forced entry, rather than entirely disregarding the knock and announce requirement.[15] This policy is sensible because, even under exigent circumstances, police announcement will usually help to ensure the safety of both the police and citizens by reducing the danger that the police will be confused with an unknown intruder. As the California Supreme Court has observed:

> [O]ne of the primary purposes of [the knock and announce requirement], in addition to the protection of individual privacy, is to prevent possible violent responses that might be aroused in a startled and fearful householder suddenly confronted with unknown persons breaking into his [or her] home for unannounced reasons. The danger that such a confrontation will result in serious injury or death to the occupant, police officers, or innocent bystanders is obviously intensified when the householder is in possession of a firearm. Thus, where the police are aware of such a weapon, the case for requiring them to give notice of their authority and purpose becomes more rather than less compelling.

*Dumas*, 512 P.2d at 1213 (citation omitted).[16]

Two of our own recent cases, *(Craig) Williams* and *Culp*, illustrate these principles. In both of these cases, we concluded that exigent circumstances justified forced entries, attempted *after* the police had knocked and announced their presence, where there was clear and direct evidence that the suspects possessed automatic weapons on the premises to be searched and that there was a realistic possibility that the suspects would use these weapons against the police.

In *(Craig) Williams*, ERT officers executing a search warrant rammed open a door about three to five seconds after knocking and announcing themselves. In concluding that the forced entry was justified, we took note of the following factors. First, an informant who had made a drug buy on the premises five days before the execution of a search warrant had told police that there were weapons on the premises and that a guard with an automatic gun was seated in the living room next to the front window. Second, when the police parked outside the house on the day of the search, a man leaving the house saw them and ran back inside yelling "police officers." Third, the occupants were suspected drug dealers. Finally, after the police had announced their presence at the door of the house, they heard people running inside. We also noted that these facts distinguished the situation from a case

wounded, earlier that afternoon), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971).

**15.** *See Culp*, 624 A.2d at 464 n. 7 (citing *United States v. Bonner*, 277 U.S.App.D.C. at 275, 874 F.2d at 826, for proposition that degree of exigency needed to excuse noncompliance with § 3109's announcement provision is greater than that needed to excuse noncompliance with only refusal portion of § 3109); *see also (Craig) Williams*, 576 A.2d at 707 (same). Of course, a still greater degree of exigency is necessary to justify a completely warrantless entry than an entry with a warrant where the police only fail to comply with the knock and announcement requirement. *See Bonner*, 277 U.S.App.D.C. at 275, 874 F.2d at 826.

**16.** This is not to say that, where police have a reasonable basis for believing that they might be

attacked, they need wait any longer to enter once they have knocked and announced themselves. While officers attempting to execute a search warrant should not generally attempt a forced entry unless they have been refused admittance, either actually or constructively, we recognize that, in a situation where violence is likely, they stand in a particularly vulnerable position once they have announced themselves. The longer the police wait, the more readily the occupants may arm themselves. *See Bonner*, 277 U.S.App.D.C. at 276, 874 F.2d at 827 (danger to police officers increased once they identified themselves and waited before the door). Consequently, we doubt that there is a sound policy basis for lessening still further the degree of exigency required to excuse a forced entry where police have knocked and announced themselves and waited briefly but not long enough for them to have inferred a constructive refusal.

where the police know only that the suspect possesses a weapon:

> The limitation that "police knowledge of the existence of firearms excuses compliance with announcement requirements only where the officers reasonably believe the weapon will be used against them if they proceed," is of no avail to appellant where the police have reliable information that someone is guarding the front door with an automatic gun. A police officer could reasonably perceive a meaningful distinction between someone who is generally known to keep a gun and someone who is known to be guarding a door with an automatic gun, particularly where the latter has been forewarned that the police are coming.

576 A.2d at 706 (quoting *Dumas*, 512 P.2d at 1213).

More recently, in *Culp*, we also concluded that exigent circumstances justified a forced entry to execute a warrant to search the home of a man suspected of committing as many as twelve robberies using an Uzi machine gun. In that case, an informant reported having seen such a weapon at the suspect's home within the previous twenty-four hours. The informant also told police that the suspect had spoken of committing another robbery. Furthermore, in two of the previous robberies, the suspect had wielded the Uzi in an especially threatening manner: in one incident he had taken a person hostage as a human shield; in another, he had "racked the gun action" in preparation to shoot. Finally, the suspect had a record of violence and PCP use and was known to be using PCP at the time. *Id.*, 624 A.2d at 463–64.

The case before us is much closer than either *(Craig) Williams* or *Culp*. The gun that Poole had allegedly used in the robberies was a revolver; while still deadly, it posed less of a danger to the police than the automatic weapons possessed by the suspects in *(Craig) Williams* and *Culp*.[17]

Also, in this case the police had no direct information showing that this gun would be on the premises, as they had in *(Craig) Williams* and *Culp*. However, on careful consideration of the information known to the police at the time of the raid on 510 Ridge Road, we conclude that the police acted reasonably in making a forced entry after they had announced their presence.

First, it was reasonable for the police to believe that a weapon was on the premises. As Sergeant Scott observed, the evidence available to the police indicated that Poole had brandished a pistol in several armed robberies, including the January 25, 1990, robbery of Nina's Beauty Salon. No weapon had been recovered. Hence, the police could reasonably conclude that Poole might still possess this weapon. *See United States v. (Mark) Harris*, 629 A.2d 481, 490 (D.C.1993) (police had reason to believe suspect still armed where he had used handgun in murder and no weapon had been recovered); *Commonwealth v. (James) Williams*, 316 Pa.Super. 100, 462 A.2d 813, 816 (1983). Furthermore, the police could reasonably think that Poole would likely be present in the Ridge Road apartment, since they had information strongly suggesting that 510 Ridge Road was indeed Poole's home address and the raid took place relatively early on a Saturday morning. *See (Mark) Harris*, 629 A.2d at 490.

Second, the ERT officers possessed information that could reasonably lead them to believe that Poole might well use a weapon to resist arrest. They knew that Poole was a suspect in several armed robberies, during which he had brandished a gun to threaten his victims. They also knew that Poole had been charged with assault on a police officer (though not necessarily convicted). Like the evidence in *Culp* of the suspect's record for violence and PCP use and his threatening behavior in a string of armed robberies, this information gave the police a reasonable basis for fearing that Poole might use deadly

---

17. In *Culp*, the trial judge emphasized that the Uzi believed to be in the defendant's possession "wasn't just any kind of weapon, it was an automatic or at least semiautomatic machine gun type weapon which was capable of inflicting tremendous damage in a very short period of time before the officers could adequately defend themselves." 624 A.2d at 463 (internal quotation marks omitted).

force against them. *See Culp,* 624 A.2d at 463–64; *see also United States v. Scott,* 520 F.2d 697, 700–01 (9th Cir.1975) (no announcement required where police officers had probable cause to suspect that armed robbers, who had wielded sawed-off shotgun and revolvers during robbery, were in apartment), *cert. denied,* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976); *United States v. McShane,* 462 F.2d 5, 6 (9th Cir. 1972) (failure to announce before entering was nevertheless lawful where Treasury agents knew that suspect was armed with sawed-off shotgun and had been convicted previously for armed assault against a police officer); *Commonwealth v. Cundriff,* 382 Mass. 137, 415 N.E.2d 172, 178 (1980) (trial court's finding that announcement would have endangered police amply supported where defendant was suspect in armed robbery involving handguns and sawed-off shotgun), *cert. denied,* 451 U.S. 973, 101 S.Ct. 2054, 68 L.Ed.2d 353 (1981). The fact that appellant had reacted peacefully when a police officer approached him on the street several days after the robberies (and merely admonished him about repairing cars on the street) did not dispel the legitimate concern the police had in a much more dangerous context: that there was a realistic possibility he would respond violently to the arrival in force of police announcing their intent to search his apartment.

Finally, we bear in mind that the officers had partially complied with the statute by knocking and announcing their identity and purpose, and additional delay would have increased their peril. *See Bonner,* 277 U.S.App.D.C. at 276, 874 F.2d at 827. Consequently, the degree of exigency required to justify their forced entry is less than it would be had they failed to make any announcement whatsoever.

Accordingly, taking into account all these factors, we conclude that there were exigent circumstances sufficient to justify the forced entry after the police had knocked and announced their identity and purpose.

Appellants' arguments do not dissuade us from that conclusion. This is not a case, as appellants contend, where the police themselves created the potential for violence. Because the police had a search warrant for the apartment, it was not enough for them merely to wait to encounter Poole outside the apartment; sooner or later, the police had to enter the apartment to execute the warrant. Thus, this case is readily distinguishable from *McKnight v. United States,* 87 U.S.App.D.C. 151, 183 F.2d 977 (1950), where the police deliberately passed up an opportunity to execute an arrest warrant outside the suspect's residence so that they would have a pretext for entering and searching his home without a search warrant. Moreover, given the fact that Poole had acted with a confederate, the police still would have faced potential danger even if they had maintained 510 Ridge Road under surveillance and waited for Poole to leave the apartment before attempting to execute the search warrant.

■ Nor do we accept appellants' contention that "[w]here nothing suspicious arises during the course of executing the warrant, the exigent circumstances exception does not apply." Appellant Showell's Brief at 20. Exigent circumstances are not limited to last minute surprises that are discovered by the police only after they have arrived on the scene. For instance, all of the information justifying the forced entry in *Culp* was known to the police well before they executed the warrant.[18]

---

**18.** The only additional factor that came to light once the police were on the scene in *Culp* was the fact that, after the officers had knocked at the door, the occupants within stopped talking. *Culp,* 624 A.2d at 461–62. Neither the trial judge nor the *Culp* panel emphasized this factor in concluding that the forced entry at issue in that case was justified by exigent circumstances.

It is true that in *(Craig) Williams,* the trial judge found that a man leaving the house to be searched had seen the police and then run back inside to warn the occupants, thus creating an "added, immediate danger for the officers who would execute the search warrant." 576 A.2d at 705. In upholding the trial judge's determination that exigent circumstances existed in that case, the *(Craig) Williams* panel referred to some of the legislative history surrounding Congress's repeal of a short-lived provision for no-knock warrants in the District of Columbia. *See* Pub.L. No. 93–481 § 4(a) (repealing D.C.Code § 23–591), *cited in (Craig) Williams,*

■ Having reached this conclusion, we must be clear about what we are not holding. We do not hold that exigent circumstances sufficient to excuse a forced entry exist anytime that the search is related to a violent crime. To adopt such a generalized exception to the knock and announce requirement would amount to virtually rewriting D.C.Code § 23–524.[19] Failure to

observe the statutory requirement that the police knock, announce their purpose and identity, and wait to be refused admittance before attempting a forced entry, "cannot be justified by a general assumption that certain classes of persons subject to arrest are more likely than others to resist arrest, attempt to escape, or destroy evidence." *People v. Rosales*, 68 Cal.2d 299, 66 Cal.

576 A.2d at 705 n. 9; *see also supra* note 6. The panel quoted a statement from the Congressional Record according to which, after the repeal of the no-knock statute, no-knock searches would be "permitted ... only when exigent circumstances become known to Government agents immediately prior to their contemplated search." 120 Cong.Rec. 35,904 (1974) (statement of Sen. Bayh), *quoted in (Craig) Williams,* 576 A.2d at 705. The *(Craig) Williams* panel did not, however, specifically endorse this remark as the litmus test for the legality of any search that does not fully comply with the requirements of 18 U.S.C. § 3109. Indeed, *(Craig) Williams* also recognized there are circumstances, such as the presence of guns, that "can hardly be deemed ... free of danger for the entering police," notwithstanding the fact that they do not constitute "a one-time activity." *(Craig) Williams,* 576 A.2d at 705. Moreover, the actual conference report comment on the repeal of the no-knock statute does not suggest that Congress intended to delimit in advance the contours of the exigent circumstances exception:

Although various exceptions to the [knock and announce] rule have been identified by the courts, the courts have not been consistent in defining what standard of proof is needed *to justify the various exceptions or what set of* facts will satisfy a particular standard of proof. Furthermore, since the courts are continuing to define and explicate the exceptions to the announcement rule, the conferees do not intend the references in this statement to specific examples of exceptions (and the facts underlying them) as being an enumeration of the only exceptions to be permitted in the District of Columbia. Rather, it is the intent of the conferees that the common law exceptions, as they may be prescribed by judicial decisions which must be adhered to in the District of Columbia, apply in the District. It is the conferees' intent that D.C. police be required to announce their authority and purpose in the same situations in which other Federal law enforcement officers are required to make such announcement. Conversely, they should be excused from compliance with the rule in those situations where other Federal law enforcement officers are excused. This is achieved by repeal of D.C.Code 23–591, and the concomitant application of 18 U.S.C. 3109 to the D.C. police.

H.R.Conf.Rep. No. 1442, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 5974, 5977.

While one federal court of appeals has said that "[t]he exigent circumstances exception to 18 U.S.C. § 3109 was developed so as to allow officers to formulate an immediate response to emergency situations that arise on the scene during the execution of a search warrant," *Stewart, supra* note 13, 867 F.2d at 585, numerous other courts have concluded, as we did in *Culp,* that exigent circumstances existed even where the information relied on by the police was known to them well before they arrived on the scene, *see Turner, supra* note 14, 926 F.2d at 887 (evidence of exigent circumstances based entirely on facts known to police before they arrived at suspect's residence; no evidence that suspect knew of police presence); *Nabors, supra* note 12, 901 F.2d at 1354–55 (evidence of exigent circumstances drawn entirely from affidavit furnished for search warrant); Annotation, *Sufficiency of Showing of Reasonable Belief of Danger to Officers or Others Excusing Compliance with "Knock and Announce" Requirement—State Criminal Cases,* 17 A.L.R.4th 301, § 6 (1982 & 1992 Supp.) (collecting state cases where belief or knowledge that suspect had weapon, coupled with other information gained prior to arrival at entry site, was held sufficient to excuse compliance with knock and announce requirement).

**19.** *See People v. Gastelo,* 67 Cal.2d 586, 63 Cal. Rptr. 10, 12, 432 P.2d 706, 708 (1967) (en banc) ("Neither this court nor the United States Supreme Court has held that unannounced forcible entries may be authorized by a blanket rule based on the type of crime or evidence involved.... The [knock and announce] statute does not contain the seeds of such far-reaching self-destruction."), *quoted in Meyer v. United States,* 386 F.2d 715, 717–18 (9th Cir.1967); *Commonwealth v. Grubb,* 407 Pa.Super. 78, 595 A.2d 133, 136 (1991) ("[T]o accept the Commonwealth's argument is to recognize a presumption whereby exigent circumstances sufficient to do away with the knock and announce rule would exist any time a search for drugs is conducted.... Such a fundamental change in the knock and announce rule should not be made by judicial determination ... but must be addressed in careful and studied deliberation by the legislature.").

Rptr. 1, 5, 437 P.2d 489, 493 (1968).[20] Where the government alleges that exigent circumstances excused compliance with the statute, that claim must be supported by specific evidence particular to the facts of the individual case.

In this case, the police reasonably believed that appellant was on the premises, had a gun, and would use it if confronted. More specifically, because the police had information that appellant had brandished a weapon in several armed robberies and had been charged with assaulting a police officer, they reasonably feared that appellant would use a gun to resist arrest and thus were justified in making entry after partial compliance with the statute.

### III. THE LINEUP IDENTIFICATIONS

Both appellants contend that the government violated their Sixth Amendment rights to counsel by conducting lineups at which they were unrepresented by counsel. Consequently, appellants argue, the trial court committed reversible error in admitting identification testimony based on these lineups, including not only identifications made at the actual lineups but also identifications made by witnesses viewing photographs of the lineups.

### A. The Lineups and Identifications

Poole was arraigned on August 9, 1990. At that time, according to Poole's suppression motion filed below, the court issued a lineup order for August 29, 1990. Poole's counsel objected to the date because of a conflict. On August 27 and 28, Poole's counsel contacted police detectives to inform them of the conflict. According to Poole's counsel, the detectives said that they would attempt either to schedule a different lineup for the same time or to obtain substitute counsel. When Poole's counsel called again on August 29, he was unable to reach the detectives, but he did ascertain that Poole's lineup was to go forward. At the last minute, Poole's counsel managed to obtain substitute counsel, but only in time for this substitute to be present as the last two witnesses (out of a total of fifteen) viewed the lineup.

According to the government's brief, Showell was arraigned on February 5, 1990, in connection with another hair salon robbery that had taken place on January 19, 1990—not the robbery for which she was convicted. At that time, the magistrate signed an order compelling Showell and her counsel to appear for a lineup on February 15, 1990, as a condition of her release. For whatever reason, however, Showell's counsel did not appear on February 15.

Appellants moved to suppress all identification testimony based upon these lineups, arguing that the lineups were (1) improperly suggestive, thereby violating their Fifth Amendment rights to due process, and (2) conducted in the absence of counsel, thereby violating their Sixth Amendment rights.[21] The trial court denied appellants' motions, finding that the lineups were not improperly suggestive, that the government had given counsel adequate notice of the lineups, that consequently it was not the government's fault that appellants were not represented by counsel, and that appellants had in any case failed to show

---

**20.** *See also Nabors, supra* note 12. *Cf. United States v. Moore,* 956 F.2d 843, 850 (8th Cir.1992) ("a blanket rule permitting no-knock search warrants in all drug cases ... is patently unjustifiable and would invite unnecessarily violent and intrusive execution of many search warrants")

**21.** Appellants do not renew their Fifth Amendment due process claims on appeal, except as subsidiary arguments in support of their Sixth Amendment arguments.
We also note that Showell's suppression motion, apparently filed when the two appellants were to be tried separately, does not appear in the record for this case. It is clear from the docket and the transcript of the suppression hearing that Showell's motion questioned whether the lineup photos were suggestive and therefore subject to exclusion on Fifth Amendment grounds, but it is unclear whether Showell also argued for suppression on Sixth Amendment grounds, *i.e.,* absence of counsel. Since the government does not argue on appeal that Showell failed to preserve this issue adequately below, we will consider it.

prejudice.[22]

At trial, the government played for the jury a videotape of Poole's lineup, in which one witness, Michelle Coats, identified Poole as the armed robber. Two other witnesses attended Poole's lineup: Ron Oliphant, who had earlier identified Poole in the street at Ridge Road, and Michele Mitchell. Oliphant testified that he had identified Poole at the lineup. Mitchell testified that she had told the police that she could not identify anyone at the lineup but that later she had picked out Poole from a photo of the lineup, although she was "not one hundred percent sure" of her identification. Six other witnesses testified that they had identified Poole from the lineup photo. As for Showell, one witness, Marjorie McCoy, testified that she had identified Showell as the robber's accomplice at a lineup, while four others testified that they had identified Showell from a photograph of this lineup.

## B. Standard of review

The Sixth Amendment right to counsel applies to any lineup that occurs "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *see also United States v. Wade,* 388 U.S. 218, 237, 87 S.Ct. 1926, 1937–38, 18 L.Ed.2d 1149 (1967) (accused has right to counsel at post-indictment lineup); *Gilbert v. California,* 388 U.S. 263, 272, 87 S.Ct. 1951, 1956, 18 L.Ed.2d 1178 (1967) (same). Identifications made at such a lineup in the absence of counsel are subject to a *per se* exclusionary rule,[23] but the erroneous admission of a lineup identification is not reversible *per se. See Gilbert,* 388 U.S. at 273, 87 S.Ct. at 1957. Rather, we review the case to deter-

mine whether the error was harmless beyond a reasonable doubt. *See id.* at 274, 87 S.Ct. at 1957 (remanding case for state court to determine whether erroneous admission of testimony concerning lineup identifications made in absence of counsel was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *(David) Washington v. United States,* 377 A.2d 1348, 1350 (D.C.1977) (applying harmless constitutional error test to alleged violation of appellant's right to counsel at lineup).

## C. Lineups vs. Lineup Photos

In this case, appellants challenge the identification testimony given, not only by persons who attended the lineup of the person they identified, but also by persons who never attended the actual lineup and merely viewed a photograph of that lineup. Appellants contend that the trial court should have suppressed these photo identifications as fruits of an illegal lineup.

As appellants appear to concede, they cannot base this claim upon the absence of counsel when witnesses viewed the lineup photos. The Supreme Court has held that the right to counsel does not apply when a witness is merely viewing a photograph of the accused. *See United States v. Ash,* 413 U.S. 300, 321, 93 S.Ct. 2568, 2579, 37 L.Ed.2d 619 (1973). Following *Ash,* we have concluded that it makes no difference if the photo portrays a lineup; the right to counsel still *does not apply* to the viewing of the photo. *See (Clyde) Thomas v. United States,* 382 A.2d 24, 27 (D.C.1978); *(Daniel) Williams v. United States,* 379 A.2d 698, 699 (D.C.1977).

Appellants argue, however, that the absence of counsel at the lineup itself necessarily tainted any identification based upon

---

**22.** With regard to the Sixth Amendment argument, the trial court directly addressed only Poole's contentions when it made its oral ruling denying suppression. We treat the trial court's ruling on this issue as applying to both appellants, however, since neither the government nor appellants contend otherwise. *See supra* note 21.

**23.** In-court identifications by witnesses who attended the lineup must also be excluded unless the government can "establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *Wade,* 388 U.S. at 240, 87 S.Ct. at 1939; *see also Gilbert,* 388 U.S. at 272, 87 S.Ct. at 1956.

the later viewing of a photo of that lineup, even if the person making the identification never attended the original lineup. We reject this argument.

The Supreme Court has deemed counsel's presence at a lineup indispensable in large part due to "the accused's inability effectively to reconstruct at trial any unfairness that occurred." *Wade*, 388 U.S. at 231–32, 87 S.Ct. at 1934; *see also Ash*, 413 U.S. at 312–13, 93 S.Ct. at 2575. The same difficulty does not inhere in a photographic identification. As Justice Stewart noted in his concurring opinion in *Ash*, there is a fundamental difference between a photographic identification and a lineup identification, insofar as defense counsel can more readily reconstruct the identification procedure when it involves the viewing of photographs:

> A photographic identification is quite different from a lineup, for there are substantially fewer possibilities of impermissible suggestion when photographs are used, and those unfair influences can be readily reconstructed at trial. It is true that the defendant's photograph may be markedly different from the others displayed, but this unfairness can be demonstrated at trial from an actual comparison of the photographs used or from the witness' description of the display. Similarly, it is possible that the photographs could be arranged in a suggestive manner, or that by comment or gesture the prosecuting authorities might single out the defendant's picture. But these are the kinds of overt influence that a witness can easily recount and that would serve to impeach the identification testimony. In short, there are few possibilities for unfair suggestiveness—and those rather blatant and easily reconstructed. Accordingly, an accused would not be foreclosed from an effective cross-examination of an identification witness simply because his counsel was not present at the photographic display.

*Ash*, 413 U.S. at 324–25, 93 S.Ct. at 2581–82 (Stewart, J., concurring); *see also id.* at 319, 93 S.Ct. at 2578 (majority opinion) ("Although we do not suggest that equality of access to photographs removes all potential for abuse, it does remove any inequality in the adversary process itself and thereby fully satisfies the historical spirit of the Sixth Amendment's counsel guarantee.") (footnote omitted).

We believe that this distinction between lineups and photos similarly forecloses appellants' argument in this case. With the exception of Mitchell, who attended Poole's lineup, no witnesses who made identifications based on lineup photos had previously attended the original lineup of the same defendant they identified.[24] Thus, except in the case of Mitchell, the situation was entirely comparable to the viewing of a photo array. *See People v. Curtis*, 113 Ill.2d 136, 100 Ill.Dec. 735, 739, 497 N.E.2d 1004, 1008 (1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1890, 95 L.Ed.2d 497 (1987). Any impropriety that may have occurred in the absence of counsel at the original lineups could have tainted a later photographic identification only insofar as the photos themselves may have been suggestive. These photos, however, were readily available for counsel's inspection. Counsel's absence from the lineups did not, therefore, hinder appellants from reconstructing the identification process or from making a suggestivity argument to the court; "the attorneys' ability to cross-examine the witness would not have been any greater if they had been present when the lineup pictures were taken." *Id.* Consequently, identifications based upon the lineup photos alone did not implicate appellants' right to counsel, notwithstanding counsel's absence at the actual lineups. *See id.; cf. Edwards v. Butler*, 882 F.2d 160, 164 (5th Cir.1989) (right to counsel does not apply when police photograph suspect). Accordingly, we conclude that the trial court did not err in admitting identifications, whether in-court or out-of-court, by witnesses who had only seen photographs of the lineups, rather than attending the lineups themselves.

---

**24.** McCoy, who identified Poole from a lineup photo, attended Showell's lineup but not Poole's.

Mitchell, who identified Showell from a lineup photo, attended Poole's lineup but not Showell's.

*See Curtis,* 100 Ill.Dec. at 739, 497 N.E.2d at 1008 (no error in admission of testimony concerning identification of accused from photo of lineup, notwithstanding fact that lineup was conducted without counsel).

## D. Harmless Error Analysis

We turn now to the identification testimony given by those witnesses who actually attended the lineup of the person they identified, *i.e.,* Oliphant's, Coats's, and Mitchell's identifications of Poole and McCoy's identification of Showell. The government argues that this testimony should not be suppressed, notwithstanding the absence of counsel at the lineups, because defense counsel had adequate notice of the lineups [25] and because videotaping made it possible to reconstruct the lineups at trial.[26] Furthermore, the government contends that Showell's right to counsel with respect to this case had not yet attached because at the time of her lineup she had been arraigned only in connection with another robbery and had not yet been charged in the January 25, 1990, robbery. We need not consider these arguments, however, because we conclude that, assuming that the admission of these identifications was error, it was harmless beyond a reasonable doubt.

Even excluding the identification testimony given by the witnesses who attended the lineup of the person they identified, the evidence against both appellants was very strong. Six other witnesses identified Poole and four other witnesses identified Showell. Since the robbery had lasted for some ten to twenty minutes, these witnesses had had ample opportunity to view their assailants. Thus, the identification testimony given by witnesses who attended the lineup of the person they identified was at most cumulative, since it merely corroborated very substantial identification evidence that was otherwise available to the jury.

We note further that, well before he attended Poole's lineup, Oliphant had iden-

**25.** This court has not squarely confronted the question whether mere notice of a lineup is sufficient to satisfy a defendant's right to the assistance of counsel. In *(David) Washington,* 377 A.2d at 1350–51, the police erroneously told defense counsel that his client was not in the lineup and that the witnesses were not there. After counsel left, however, witnesses did arrive and identified the appellant. This court held that, assuming that this constituted a Sixth Amendment violation, it was harmless beyond a reasonable doubt given the reliability of an eyewitness's testimony, the lack of suggestivity of the lineup (as reviewed through a photograph by the appellate panel), and the fact that the lineup photo was introduced into evidence, providing defense counsel the opportunity to argue suggestivity.

Caselaw on this issue in other jurisdictions appears to be sparse. *Compare State v. Smith,* 357 So.2d 798, 802 (La.1978) ("The State should not be prevented from using evidence obtained through a line-up when that line-up was fairly conducted merely because the defendant's attorney decides not to attend and does not request that it be delayed.") *and People v. Styles,* 90 Misc.2d 861, 395 N.Y.S.2d 1007, 1011 (N.Y.Sup. Ct.1977) (prosecution should not be penalized for failure of Legal Aid Society to provide substitute counsel for defendant, where Society was given more than 72 hours to do so) *and Webster v. State,* 299 Md. 581, 474 A.2d 1305, 1317–18 (1984) (identification evidence obtained from pre-arraignment lineup without presence of de- fense counsel, in violation of state statute, not subject to *per se* exclusionary rule where police gave public defender adequate notice of lineup) *with People v. Collins,* 20 Cal.App.3d 601, 97 Cal.Rptr. 821, 824 (1971) (police erred in holding lineup in counsel's absence just one hour after notifying public defender).

**26.** Specifically, the government asserts that, because the videotapes enabled counsel to reconstruct the lineups adequately at trial, the lineups were no longer "critical confrontations" requiring the presence of counsel. Appellee's brief at 38. We do not accept the proposition that merely videotaping a lineup renders the presence of counsel superfluous. Unlike a photographic identification, which enables defense counsel and the court to view exactly the same object seen by the witness, a videotape of a lineup is only a representation, which may be more or less complete, of what the lineup witnesses saw and heard. At the very least, the use of a videotape as a substitute for the presence of counsel would require extensive proof that the videotape accurately represented the entire lineup procedure, including not only the lineup itself but also the actions of all witnesses and government personnel present. In some instances, a sufficient record of this sort might justify a conclusion of harmless error. But we do not have such a record here. We therefore do not take the availability of the videotapes into account in conducting our harmless error analysis.

tified Poole on Ridge Road. Thus, even assuming that Oliphant's identifications of Poole at the lineup and thereafter were suppressible due to the absence of counsel at the lineup, Oliphant's testimony concerning his initial sighting of Poole on Ridge Road remained admissible.

Finally, the government presented other evidence linking Poole and Showell to the crime and to one another. Four witnesses identified the gun found at 510 Ridge Road as resembling the gun used in the robbery. Also, a photograph recovered from 510 Ridge Road showed Poole and Showell together.

In light of such overwhelming evidence, we conclude that any prejudice to appellants' rights resulting from the absence of counsel at their lineups was harmless beyond a reasonable doubt. *See Miley v. United States,* 477 A.2d 720, 724 (D.C. 1984) (even in cases of alleged constitutional error, "reversal of the conviction is uncalled for where the evidence against the accused was overwhelming"); *(David) Washington,* 377 A.2d at 1350–51.

### IV. POOLE'S REMAINING ARGUMENTS

#### A. *Other Crimes Evidence*

Poole contends that the government improperly introduced evidence implicating him in other crimes, thereby prejudicing the fairness of his trial. *See Drew v. United States,* 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964) ("evidence of one crime is inadmissible to prove *disposition* to commit crime"). Specifically, Poole complains of statements concerning (1) "two bags containing white powder" recovered at 510 Ridge Road and (2) his arrest for other reasons in New Jersey. At trial, however, defense counsel failed to raise any objection to these statements, nor did he request any limiting instruction. We therefore review for plain error. *See Johnson v. United States,* 596 A.2d 980, 986 (D.C.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1987, 118 L.Ed.2d 585 (1992); *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

■ A police detective mentioned the "two bags containing white powder" when the prosecutor asked him to describe a photograph of the contents of a drawer from the apartment at 510 Ridge Road. Neither the prosecutor nor any of his witnesses ever referred to the bags of white powder again or ever spoke of them in any way that would identify the white powder as drugs. Later, in a conference on the admissibility of the photograph itself, the trial judge raised on his own the reference to the bags. He noted that the bags were "mentioned quickly in passing" and he concluded that he didn't "think that it would be caught on . . . ." Showell's counsel also said that "nobody caught it. Not even the jurors caught it." The trial judge decided not to admit the photograph "[o]ut of an abundance of caution."

While we are sensitive to the "especially inflammatory nature of evidence of illegal drug use," *see Robinson v. United States,* 623 A.2d 1234, 1241 (D.C.1993), we conclude that on this record the single, unelaborated reference to "white powder" was not "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial," *Watts,* 362 A.2d at 709.

■ The reference to Poole's arrest in New Jersey arose under the following circumstances. In order to show Poole's appearance at the time of the robbery, the government sought to introduce a photo of Poole that had been taken on February 1, 1990, when he had been arrested for a traffic violation in New Jersey. Poole's counsel agreed to stipulate that "Mr. Poole was arrested on February 1st, 1990 at 9:50 a.m. in Salem County, New Jersey" and that the photo was a "fair and accurate photo of how Mr. Poole looked at the time of his arrest." There was no reference to Poole's having been arrested for any other crime, and, as the trial court observed and Poole's counsel himself later noted, the most natural inference the jury would have drawn from the stipulation was that Poole had been arrested for the robbery for which he was on trial. Indeed, there was no evidence from which the jury could have

inferred that Poole had been arrested for any other crime. Moreover, the trial court refused to allow the government to argue that the location of this arrest showed that Poole was fleeing from this crime. Accordingly, we conclude that there was no plain error in the admission of this stipulation.

## B. The Prosecutor's Closing Argument

Poole also contends that he was unfairly prejudiced by statements in the prosecutor's closing argument suggesting that both Poole and his lawyer had tried to intimidate the government's witnesses. At the outset of his closing argument, the prosecutor made the following observations:

> This was a serious crime. You know that because you saw the witnesses that came in here, and you had a chance to observe their demeanor. Some of them started to get upset during the course of their examination because this is a painful thing. And a lot of them were scared.... You should probably know it is not an easy thing to stand up here if you are one of these women and pick out Mr. Poole, even though you know that the situation is safe, because there is a physical trauma and a mental trauma that goes with it. But we asked each of the witnesses, do you think that the fact that you were afraid affected your ability to pick these people out, and there was no person, except for [one witness], who said she couldn't pick out anyone. Do you remember what they said? ... Yes, I was scared. Yes, I was frightened. But no, I remember the guy that did it.

Later, the prosecutor added,

> And just what the Defense lawyers were doing in a large measure, you may think they were trying to intimidate these witnesses in kind of a nice way. ["]How long did it take?["] ["]Ten minutes.["] ["]Are you sure?["] ["]Well, I don't know. Maybe longer. I don't know.["] And just like they tried to intimidate the witnesses, [Poole's counsel] is trying to intimidate you all.

At that point Poole's counsel objected, and the trial court sustained the objection. Defense counsel did not request any further instruction, however. Accordingly, we will reverse only if the failure of the trial court to take any additional corrective action constituted plain error. *See McGrier v. United States*, 597 A.2d 36, 48 (D.C.1991).

The first statement, taken by itself, was clearly not improper. The prosecutor was arguing that the government's witnesses were scared as a result of the robbery, not as a result of any other action by Poole. The second statement may have gone too far, insofar as the word "intimidate" could be understood to mean that the defense lawyers were improperly threatening both witnesses and jurors. Considered in the context of the entire trial, however, this single statement was not so extreme as to undermine the very integrity of the proceedings. As we have already noted, the evidence against Poole was very strong; the court cut off the prosecutor at that point in his argument; and defense counsel did not request any further instructions. As we observed of another prosecutor's "ill-chosen" words:

> *Ad hominem* attacks against opposing counsel are uncalled for and unprofessional. The prosecutor would have done better ... to choose his words more carefully.... We cannot agree with appellants, however, that his remarks were egregious, or that in context they had any significant potential for affecting the verdict.

*Irick v. United States*, 565 A.2d 26, 34 (D.C.1989) (citations omitted).

## C. Merger and Sentencing

Poole claims that his conviction for possession of a firearm during a crime of violence, D.C.Code § 22–3204(b), merges with his predicate convictions for armed robbery, burglary while armed, and assault with intent to commit robbery while armed. In *(Michael) Thomas v. United States*, 602 A.2d 647 (D.C.1992), this court faced a similar claim that the crime of possessing a firearm while committing a dangerous crime should merge with distribution of a controlled substance while armed and pos-

session with intent to distribute while armed. We held that the D.C. Council "did not intend for the offense defined by 3204(b) to merge with an offense subject to the enhanced penalty provision of 3202" for armed offenses. *Id.* at 650. That holding clearly applies to this case and forecloses further consideration of Poole's merger claim.

██ As for Poole's one-sentence assertion that his sentences are "undue and oppressive, given the acts constituting the offenses for which he was convicted," it is well established that this court will not "review on appeal sentences which are within statutory limits, upon the ground that such sentences are too severe." *In re L.J.*, 546 A.2d 429, 434 (D.C.1988). Since Poole does not allege that his sentence conflicts with statutory guidelines, we need not consider his claim further.

### D. The § 23–110 Claim

Poole argues, finally, that the trial court erred in denying without a hearing his motion to vacate his conviction under D.C.Code § 23–110 (1989 Repl.).[27]

██ The trial court is statutorily required to hold a hearing on § 23–110 claims "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." D.C.Code § 23–110(c). A hearing is not required where the petitioner's claims (1) are "vague and conclusory," (2) are "palpably incredible," or (3) "would not merit relief even if true." *Wright v. United States*, 608 A.2d 763, 766 (D.C.1992), and cases cited therein.

██ In his motion, Poole alleged that government witnesses perjured themselves, that the prosecutor had manufactured evidence, that newly discovered evidence would exonerate him and prove the foregoing claims, and that his defense counsel was ineffective. As the trial court found, these allegations are "totally devoid of specifics." Although the motion repeatedly refers to four documents constituting newly discovered evidence, there is absolutely no statement of what the documents are or what information they contain. In the absence of more specificity, we conclude that most of Poole's claims are vague, conclusory, and palpably incredible. Accordingly, the trial court did not err in dismissing them without a hearing.

The only one of Poole's assertions that merits more than cursory consideration is the ineffective assistance claim. Specifically, Poole alleged that his counsel was ineffective in failing (1) to be present at his lineup, (2) to file adequate pretrial motions, including a challenge to the validity of the warrants for his arrest and the search of 510 Ridge Road, and (3) to investigate the possible use of the "four documents" or other documents that Poole had in his possession. From the record it is clear that Poole's claim that his counsel failed to contest the warrants is simply wrong. Poole's allegations that his counsel failed to investigate the "documents" are, again, vague and conclusory. As for counsel's absence at the lineup, assuming that this constituted ineffective assistance, we conclude that Poole has failed to make the requisite showing of prejudice, *see Strickland v. Washington*, 466 U.S. 668, 691–92, 104 S.Ct. 2052, 2066–67, 80 L.Ed.2d 674 (1984), insofar as (a) the trial court found that there was nothing suggestive about the lineup, and (b) we have concluded that the

---

**27.** Showell also signed this motion and noted an appeal from its denial. On appeal, the only claim she has presented is a request that this court remand the case for a hearing on the ineffective assistance claim on the ground that counsel was deficient in failing to present sufficient evidence to obtain a *Franks* hearing. Showell and Poole did not raise this issue in their original § 23–110 motion, however; it does not surface in any form until their motion for reconsideration of the denial of the § 23–110 claim. Moreover, it appears that the trial court never ruled on the motion for reconsideration because appellants appealed the denial of their § 23–110 claim. We doubt therefore that the issue is properly before us. *See Atkinson v. United States*, 366 A.2d 450, 453 (D.C.1976). In any event, the additional evidence that Showell claims her counsel might have presented goes primarily to the question whether Poole actually lived at 510 Ridge Road. It does little to show that the police recklessly disregarded the truth in believing that Poole resided at that address.

lack of counsel at the lineup was harmless beyond a reasonable doubt.

Accordingly, for the reasons given above, appellants' convictions on all counts are

*Affirmed.*